# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

Joanna Warmington,                                    Case No. 19-cv-2767 (ECT/LIB)

        Plaintiff,

v.                                                                **OPINION AND ORDER**

Board of Regents of the University of
Minnesota,

        Defendant.

Beau D. McGraw, McGraw Law Firm, P.A., Lake Elmo, MN, for Plaintiff Joanna Warmington.

Carrie Ryan Gallia and Timothy Joseph Pramas, Office of the General Counsel, University of Minnesota, Minneapolis, MN, for Defendant Board of Regents of the University of Minnesota.

     Plaintiff Joanna Warmington is a highly accomplished, nationally recognized collegiate cross country and track and field coach.  In August 2018, Warmington resigned under threat of imminent termination from her employment as head coach of the women's cross country and track and field teams at the University of Minnesota Duluth ("UMD" or the "University").  In this case, Warmington alleges that she was constructively terminated and that her termination violated federal laws forbidding sex discrimination—Title VII, Title IX, and the Equal Pay Act.  Warmington also alleges that, while employed at UMD, she was subject to a hostile work environment on account of her sex in violation of Title VII and Title IX.  Defendant Board of Regents of the University of Minnesota, UMD's governing body, has filed a motion to dismiss Warmington's complaint pursuant to Federal

Rule of Civil Procedure 12(b)(6). The motion will be granted. Warmington has failed to plausibly plead essential elements of her Title VII and Title IX claims, and her complaint itself establishes that her Equal Pay Act claim is barred by the statute of limitations.[1]

I[2]

Warmington was employed as head coach of the women's cross country and track and field teams at UMD beginning in 2009. Compl. ¶ 19 [ECF No. 1]. Before becoming head coach, Warmington was employed as an assistant coach for the women's and men's cross country and track and field teams starting in 2007. *Id.* ¶ 20. "Warmington was on a year-to-year contract of successive 10-month terms, and [she] could be terminated at will by the University for any reason or no reason." *Id.* ¶ 1; *see also id.* ¶ 23. Warmington's coaching duties ran over three seasons—cross country in the fall, indoor track and field during the winter, and outdoor track and field in the spring. *Id.* ¶ 22.

Warmington's duties as head coach were many and varied. *See, e.g.*, *id.* ¶¶ 28–30; 84, 88–112; 141; 146–148; 157–164; 169–174; 206–218; 229–230; 240–247; 252–253; 257. She "coordinated travel, operated in compliance with an ever-decreasing budget, developed training programs for teams and individuals, recruited athletes, and marketed her program by raising funds for her program as well as the UMD Athletic Department."

---

[1]    Warmington also asserted a claim under 42 U.S.C. § 1983, but she concedes this claim must be dismissed. Pl.'s Mem. in Opp'n 16 [ECF No. 17].

[2]    In reviewing a motion to dismiss for failure to state a claim under Rule 12(b)(6), a court must accept as true all of the factual allegations in the complaint and draw all reasonable inferences in the plaintiff's favor. *Gorog v. Best Buy Co., Inc.*, 760 F.3d 787, 792 (8th Cir. 2014) (citation omitted). In accordance with these rules, the facts are taken from the Complaint.

*Id.* ¶ 29.  She spent "her personal funds to help feed the team, find them means of travel in personal vehicles, and to provide track time, uniforms, and team . . . clothing."  *Id.* ¶ 30. To further the University's interest in Title IX compliance, Warmington was directed "to take all interested students, including athletes who had no reasonable chance of taking part at a competitive level and even those who wanted to join the team just to be on a team or to try to get in better shape."  *Id.* ¶ 90; *see also id.* ¶ 88.  "Warmington also served as the sole mentor and advisor to the female athletes," *id.* ¶ 157, helping them cope with "a variety of life challenges that face college students every day," *id.* ¶ 159.

Warmington earned success at UMD.  She recruited and coached athletes who achieved individual success.  *Id.* ¶¶ 25–26.  These included "38 All Americans, 3 Individual National Champions, more than 20 Northern Sun Intercollegiate Conference ["NSIC"] Champions, 36 NSIC Team Academic Award winners," more than 700 "NSIC Athlete Academic Award [w]inners," more than 300 All American Academic Award winners, "3 UMD Outstanding Senior Athlete Award winners," and "over 30 Central Region Athletes/National Individual Champions."  *Id.* ¶¶ 25, 26.  Warmington "led her teams to 4 NSIC Conference Championships, 3 Central Region Team Championships, a 3rd place National Cross-Country finish."  *Id.* ¶ 26.  Warmington received three "NSIC Conference Coach of the Year Awards" and two "National Coach of the Year Awards." *Id.* ¶ 27.

The University treated Warmington and her teams differently from other coaches and athletic teams in a number of ways.  Though women's track and field and cross country are scholarship sports and men's track and field and cross country are not, "until

approximately 2017, [Warmington] was paid at least $5,000.00 a year less than" the men's coach, *id.* ¶¶ 82–85, though she acknowledges her pay was increased "[i]n 2016" to match the pay of the men's coach, *id.* ¶ 87.  UMD required Warmington "to carry between 50 and 60 athletes on her team . . . to make sure that the [University's] Title IX numbers matched up so the football team was able to carry the 90 to 100 football players [its coach] wanted." *Id.* ¶ 88.  This required Warmington to "take all interested students" and coach athletes with widely varying abilities and goals.  *Id.* ¶¶ 88–92.  Having such a large group of athletes with varying abilities and goals created challenges that led to "a no-win situation."  *Id.* ¶ 102; *see also id.* ¶¶ 101, 103–104.  "Other coaches were allowed to discipline athletes, kick people off, and be strict in how they ran their teams.  Warmington was not." *Id.* ¶ 104. The University undermined some of Warmington's coaching decisions.  *Id.* ¶¶ 110–131. "Warmington was forbidden from discussing nutrition and weight with her athletes," though "[n]o similar limitation has been placed on any other coach at UMD, and in many cases, like the football program, weekly weigh-ins are required for athletes and weight and body issues are routinely discussed." *Id.* ¶¶ 174–175.  The University "frequently invaded" Warmington's teams' budgets "to pay for other sports—especially overruns in the men's football and hockey budgets."  *Id.* ¶ 231.  Insufficient funding meant that Warmington's teams could not pay out of their budgets for things like a bus to take them to competitions, *id.* ¶ 210, or more than one $10 meal per day while traveling, *id.* ¶ 217.  Her athletes were required to purchase their own uniforms, *id.* ¶ 240, and her teams lacked a full-time strength coach, *id.* ¶ 249, and trainers to travel with the team to competitions, *id.* ¶ 248. Her teams were required to pay to use the University pool, *id.* ¶ 254, were forced to give

up indoor facilities to the men's football team in poor weather, *id.* ¶ 255, and had to pay to have the outdoor track cleared of snow placed there by the University when it cleared the football field, *id.* ¶ 269.   Warmington alleges that she bore many of these expenses personally, out of her own paycheck.  *Id.* ¶¶ 30, 212, 215, 218, 243, 245, 253, 257, 261.

Warmington alleges that she "faced . . . overt forms of sexual and gender-based harassment" at the University.  *Id.* ¶ 270.  Several examples demonstrate the tenor of these allegations.  Warmington was excluded from the "setup" of a conference track and field meet.  *Id.* ¶ 272(a).  Male coaches made vulgar, never-okay "gender based and sexual remarks about athletes" and others in Warmington's presence.  *Id.* ¶¶ 272(b), (f).  A male coach "stated, in front of the men's and women's teams, that Warmington was overly emotional and should coach more like him."  *Id.* ¶ 272(d).  "Male coaches and athletes routinely practiced without shirts, but Warmington was accused of creating a sexual atmosphere for wearing a running bra."  *Id.* ¶ 272(e).  A male coach photographed "Warmington randomly without her consent to save and harass her with after the fact."  *Id.* ¶ 272(g).  That same coach "would sit on the bus right next to Warmington and swear, use foul language and talk about other people on his team when he [was] upset yet would make crude remarks and comment that Warmington must have PMS or be 'on the rag' if she made similar remarks."  *Id.* ¶ 272(m).  A female athletic supervisor "patt[ed] Warmington on the head for doing 'a good job,'" and commented on Warmington's appearance.  *Id.* ¶ 273(p), (q).  A male supervisor criticized women in the UMD Athletic Department for "running a 'day care' by bringing their babies into work with them yet ha[d] no issues when [the head football coach] would bring his sick children into the office for the day."  *Id.*

¶ 273(t). "Football coaches allow[ed] their athletes to walk in the hallways with just towels on." *Id.* ¶ 273(u). The head men's basketball coach told Warmington that "she could wear little shorts or skirts to stay cool when she asked for a portable air conditioning unit for her office." *Id.* ¶ 273(v).

The University placed Warmington on administrative leave on March 28, 2018, after a group of student athletes on Warmington's cross country and track and field teams complained to the University that Warmington had created "an unwanted sexual atmosphere," and had "inappropriate discussions with athletes about their eating habits and weight." *Id.* ¶¶ 32, 67. The University's Office of Equal Opportunity and Affirmative Action ("EOAA") was responsible for investigating these complaints and it, in turn, contracted with a law firm to investigate the allegations. *Id.* ¶ 34. Warmington alleges that "[t]he manner in which the investigation was conducted and the conclusions it reached are evidence of a predetermined outcome and agenda to remove Warmington . . . based on Warmington not going along quietly when the budget for her athletes was continually cut to benefit male sports." *Id.* ¶¶ 76, 80. Warmington was not made aware of "the specific allegations against her until the conclusion of the investigation." *Id.* ¶ 33. She was not provided with the names of complaining witnesses or given an opportunity to confront those witnesses. *Id.* ¶ 37. "The timing of the leave and the subsequent investigation allowed the witnesses to compare their stories before giving information to the investigator." *Id.* ¶ 41; *see also id.* ¶ 79. Witnesses who were potentially favorable to Warmington were not interviewed, and facts favorable to Warmington were not included in the final report. *Id.* ¶¶ 52, 78(c). "Warmington was judged on a preponderance of [the]

evidence standard, which worked in the University's favor considering how the Athletic administration placed her on leave and encouraged athletes to speak to the investigator." *Id.* ¶ 50.

On Friday, August 17, 2018, the University notified Warmington by letter that it had completed its review of the investigation and its findings and "determined that just cause exists for discipline, and that termination is appropriate." *Id.* Ex. 5, at 1 [ECF No. 1-7]. The letter noted that if the University imposed that final discipline, it "would immediately become public under the Minnesota Government Data Practices Act." *Id.* To avoid that disclosure, it offered Warmington "the opportunity to resign . . . in exchange for a full release of claims against the University and agreement not to seek University employment in the future." *Id.* If she resigned before discipline was imposed, the EOAA report and any documents related to it would be considered "private data" that could be "disclosed only by court order." *Id.* A draft settlement agreement and release was included with the letter, and the University told Warmington that she could accept the settlement agreement and release any time before 5:00 p.m. the following Monday, August 20. *Id.*; *see id.* Ex. 6 [ECF No. 1-8]. The University also communicated to Warmington that she "need not sign the settlement agreement prior to the August 20 deadline," but that it would "need a written confirmation from [her] that an agreement has been reached which will later be reduced to writing." *Id.* Ex. 5, at 2. Warmington requested additional time to review the agreement and consult with an attorney, but that request was denied. Compl. ¶¶ 71–72. Warmington resigned shortly thereafter, *see id.* Ex. 6, at 9–12 ("Statement by Joanna Warmington"), but she did not sign the settlement agreement and release.

7

II

In reviewing a motion to dismiss for failure to state a claim under Rule 12(b)(6), a court must accept as true all of the factual allegations in the complaint and draw all reasonable inferences in the plaintiff's favor. *Gorog v. Best Buy Co.*, 760 F.3d 787, 792 (8th Cir. 2014). Although the factual allegations need not be detailed, they must be sufficient to "raise a right to relief above the speculative level." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (citations omitted). The complaint must "state a claim to relief that is plausible on its face." *Id.* at 570. "A plaintiff's claim is facially plausible where the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Blomker v. Jewell*, 831 F.3d 1051, 1055 (8th Cir. 2016) (quotation omitted). Allegations establishing "a sheer possibility that a defendant has acted unlawfully" are not sufficient. *Id.* (quotation omitted). As our Eighth Circuit Court of Appeals explained in *Gregory v. Dillard's, Inc.*:

> [A] plaintiff must assert facts that affirmatively and plausibly suggest that the pleader has the right he claims, rather than facts that are merely consistent with such a right. While a plaintiff need not set forth detailed factual allegations or specific facts that describe the evidence to be presented, the complaint must include sufficient factual allegations to provide the grounds on which the claim rests. A district court, therefore, is not required to divine the litigant's intent and create claims that are not clearly raised, and it need not conjure up unpled allegations to save a complaint.

565 F.3d 464, 473 (8th Cir. 2009) (en banc) (cleaned up).

8

A[3]

1

In her complaint's first count, Warmington alleges that the University terminated her employment on the basis of her sex in violation of Title VII, 42 U.S.C. § 2000e-2(a)(1). Compl. ¶¶ 281–286.  Warmington does not suggest that her Title VII claim is based on "direct evidence" of discrimination.[4]  *See id.* ¶ 285 (describing the University's "stated motivation" for her termination as a "pretext for discrimination"); Mem. in Opp'n 2 [ECF No. 17] (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973)); *see also Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 511 (2002) (noting that the *McDonnell Douglas* framework does not apply "if a plaintiff is able to produce direct evidence of discrimination").  Disparate treatment claims under Title VII based on indirect evidence ordinarily are analyzed under the *McDonnell Douglas* burden-shifting framework. *Doucette v. Morrison Cty.*, 763 F.3d 978, 982 (8th Cir. 2014).  Under *McDonnell Douglas*, Warmington must show that: (1) she is a member of a protected group; (2) she is qualified for her former position; (3) she suffered an adverse employment action; and (4) the

---

[3]     Warmington's response to Defendant's motion poses challenges owing to the length of her complaint.  The Complaint is 59 pages long.  It contains 332 separately numbered paragraphs.  More than 100 pages of exhibits are attached.  Obviously, the Complaint is the product of considerable work.  The problem is that Warmington's response often cites many paragraphs at once, *e.g.*, Mem. in Opp'n 10 (citing ¶¶ "82–144" and "206–269"), other times cites none, *e.g.*, *id.* at 14, and does not often distinguish those allegations that matter most from those that matter less.

[4]     "Direct evidence provides a strong causal link between the alleged discriminatory bias and the adverse employment decision.  It most often comprises remarks by decisionmakers that reflect, without inference, a discriminatory bias." *McCullough v. Univ. of Ark. for Med. Sciences*, 559 F.3d 855, 861 (8th Cir. 2009) (citations omitted).

circumstances give rise to an inference of discrimination. *McDonnell Douglas*, 411 U.S. at 802. If Warmington establishes a prima facie case, "the burden of production shifts to the [University] to articulate a nondiscriminatory, legitimate justification for its conduct, which rebuts [her] prima facie case." *Id.* (quotation omitted). If the University meets its burden at the second step, Warmington must "produce evidence sufficient to create a genuine issue of material fact regarding whether [the University's] proffered nondiscriminatory reason is a pretext for discrimination." *Id.* (quotation omitted). It is true that the Supreme Court has said that it "has never indicated that the requirements for establishing a prima facie case under *McDonnell Douglas* also apply to the pleading standard that plaintiffs must satisfy in order to survive a motion to dismiss." *Swierkiewicz*, 534 U.S. at 511. In *Swierkiewicz*, the Supreme Court described the *McDonnell Douglas* framework as "an evidentiary standard, not a pleading requirement." *Id.* at 510. At the same time, our Eighth Circuit Court of Appeals has made clear that the "elements of the prima facie case are [not] irrelevant to a plausibility determination in a discrimination suit." *Blomker*, 831 F.3d at 1056 (quotation omitted). Rather, they are "part of the background against which a plausibility determination should be made," and "may be used as a prism to shed light upon the plausibility of the claim." *Id.* (quotations omitted).

Warmington plausibly pleads the first three elements of a prima facie case under *McDonnell Douglas*. For purposes of its Rule 12(b)(6) motion to dismiss, the University concedes that, as a woman, Warmington belongs to a protected class, and it concedes that she is qualified for her former position. In its opening brief in support of its motion, the University argued that Warmington had not plausibly pleaded an adverse employment

action because the job challenges she alleges do not amount to materially significant disadvantages and because her allegations describing her resignation "do not meet the high bar set by courts" to plausibly show a constructive discharge. Def.'s Mem. in Supp. 8 [ECF No. 11]. However, the University did not press this argument in its reply brief and appeared to concede at the hearing on this motion that Warmington's resignation plausibly may be construed as an adverse employment action because it occurred under notice of imminent termination. Persuasive authorities support this conclusion. *See*, *e.g.*, *Green v. Town of East Haven*, 952 F.3d 394, 405 (2d Cir. 2020) (recognizing that a resignation may be a constructive discharge if "it was objectively reasonable for an employee to feel compelled to resign in order to avoid being fired"); *Harris v. Butler Cty.*, 344 F. App'x 195, 200 (6th Cir. 2009) (recognizing "that an employee's resignation may constitute a constructive discharge when the employee reasonably believed his termination to be imminent"); *Davis v. Koffee Kup Bakery, Inc.*, No. 2:15-cv-152, 2016 WL 4411399, at *6 (D. Ver. Aug. 18, 2016) ("When an employer acts in a manner so as to have communicated to a reasonable employee that she will be terminated, and the employee resigns, the employer's conduct may amount to constructive discharge.") (quoting *EEOC v. Univ. of Chi. Hosps.*, 276 F.3d 326, 332 (7th Cir. 2002)); *Murray v. Town of N. Hempstead*, 853 F. Supp. 2d 247, 269 (E.D.N.Y. 2012) ("[A] triable issue of fact as to constructive discharge may be demonstrated by proof that an employee was presented with the decision to resign or be fired.") (quotation omitted)); *Jones v. Willy, P.C.*, No. H-08-cv-3404, 2010 WL 723632, at *7 (S.D. Tex. Mar. 1, 2010) (recognizing that a threat of termination may amount to a

constructive discharge if the threat "place[s] the employee under duress, leaving him no option but to resign").[5]

Warmington has not alleged facts plausibly permitting an inference of discrimination on the basis of sex. A plaintiff asserting a sex-discrimination claim under Title VII must "show that the motive to discriminate was one of the employer's motives [underlying the adverse employment action], even if the employer also had other, lawful motives that were causative in the employer's decision." *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 343 (2013). In the context of a Rule 12(b)(6) motion to dismiss, this requirement is met by factual allegations plausibly showing that the defendant manifested bias relevant to the adverse employment action. *Id.* In *Nassar*, for example, the plaintiff "alleged that [the defendant] was biased against him on account of his religion and ethnic heritage" and alleged that this bias was "manifested by undeserved scrutiny" of the plaintiff's work habits and productivity "as well as comments that 'Middle Easterners are lazy.'" *Id.*

---

[5]     An adverse employment action is "a tangible change in working conditions that produces a material employment disadvantage, including but not limited to, termination, cuts in pay or benefits, and changes that affect an employee's future career prospects, as well as circumstances amounting to a constructive discharge." *Jackman v. Fifth Judicial Dist. Dep't of Corr. Servs.*, 728 F.3d 800, 804 (8th Cir. 2013). "[M]inor changes in duties or working conditions, even unpalatable or unwelcome ones, which cause no materially significant disadvantage, do not rise to the level of an adverse employment action." *Id.* Warmington identifies many things the University or others in the UMD Athletic Department did to make her job more difficult. However, leaving aside Warmington's allegations (1) that she was terminated and (2) that she says make out a plausible hostile-environment claim (those are addressed in Part II.B.2), Warmington did not argue, either in her brief in opposition to this motion or at the hearing, that any of these difficulties amounted to an adverse employment action for purposes of her Title VII claim. Pl.'s Mem. in Opp'n 5–9 [ECF No. 17].

Warmington identifies two specific groups of allegations in her complaint and an overarching theme that she argues "give rise to an inference of discrimination," Mem. in Opp'n at 11, but these assertions do not plausibly show that the motive to discriminate on the basis of her sex was one of the University's motives for taking adverse action against Warmington. Warmington first identifies paragraphs 168 through 174 of her complaint. In these paragraphs, Warmington alleges that she "was treated differently than other coaches" because beginning in 2017 she was "forbidden from discussing nutrition and weight with her athletes." Compl. ¶¶ 168, 174. In this same group of paragraphs, Warmington alleges that prior to 2017 she "often had discussions with athletes about nutrition and using the right foods at the right times to maximize potential, as has nearly every other coach on campus," *id.* ¶ 172, and that "[o]ver the years, several male members of the track and field coaching staff . . . would make comments about certain female athletes gaining weight and ask that Warmington talk to the athlete because she was a woman," *id.* ¶ 173. Warmington does not explain how these allegations manifested sex discrimination in relation to the termination of her employment, and no connection is apparent. Warmington next identifies paragraphs 228 through 269 of her complaint. In these paragraphs, Warmington alleges many facts tending to show that her teams' budgets and interests were sacrificed for the sake of other sports and that her teams lacked benefits the University provided other teams. *Id.* ¶¶ 228–269. These allegations plausibly show that Warmington's teams received adverse treatment relative to other UMD athletic teams. *See id.* ¶ 239 ("Warmington is not aware of this happening to any other sport."). But Warmington does not identify any connection between her teams' adverse treatment and

her sex—or, more precisely, how her teams' adverse treatment manifested sex discrimination against Warmington.  It might be different if Warmington had alleged, for example, that sports coached by women received the same or comparable disparate treatment, but that's not what she alleges.  Warmington alleges that no other UMD sport received the same treatment.  *Id.* ¶ 239.  In her brief in opposition to the University's motion, Warmington argues that "[t]he tenor of [her] Complaint is that the 'investigation' into her and, ultimately, her discharge, came . . . because Plaintiff refused to accept that her teams and her athletes would have less of everything than other athletes simply because they were women."  Mem. in Opp'n at 11.  It is true that Warmington's allegations show plausibly that her women's teams received unequal treatment in comparison to other UMD teams.  It also is true that her complaint's allegations permit a plausible inference that Warmington advocated for equality on behalf of her female athletes.  The problem is that the sex of the athletes Warmington coached, their unequal treatment, and her advocacy for their better treatment say nothing about whether Warmington's sex was a motivating factor in the University's decision to terminate her employment.  These facts do not plausibly permit an inference that the University terminated Warmington because of her sex.[6]

---

[6]     Warmington alleges that the investigation leading to her termination was pretextual, and the Complaint includes many allegations challenging the procedural fairness and accuracy of the investigative process.  Compl. ¶¶ 32–81.  Evidence of pretext may permit an inference of discrimination as part of a Title VII plaintiff's prima facie case.  *Lewis v. Heartland Inns of Am., L.L.C.*, 591 F.3d 1033, 1040 (8th Cir. 2010).  Regardless, to state a claim, a Title VII plaintiff still must allege that a motive underlying the defendant's action was discrimination, not just that its stated reason is false.  *See St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 515 (1993) (A plaintiff must show "*both* that the reason was false, *and* that discrimination was the real reason.").

2

Warmington alleges that she was subject to a hostile work environment on account of her sex, also in violation of Title VII.  Compl. ¶¶ 270–273, 283(a)–(b); Mem. in Opp'n at 9–10.  To establish a prima facie case on her claim of a hostile work environment, Warmington must allege facts plausibly showing: (1) she belongs to a protected group; (2) she was subject to unwelcome harassment; (3) a causal nexus exists between the harassment and the protected-group status; (4) the harassment affected a term, condition, or privilege of employment; and (5) her employer knew or should have known of the harassment and failed to take proper action.  *Sallis v. Univ. of Minn.*, 408 F.3d 470, 476 (8th Cir. 2005) (citing *Erenberg v. Methodist Hosp.*, 357 F.3d 787, 792 (8th Cir. 2004)). To be actionable, the work environment must be both objectively hostile to a reasonable person and subjectively hostile to the victim. *Id.* (citing *Faragher v. City of Boca Raton*, 524 U.S. 775, 787 (1998)).  To show an objectively hostile work environment, "the harassment must be severe or pervasive."  *Duncan v. Cty. of Dakota*, 687 F.3d 955, 960 (8th Cir. 2012) (citing *Kratzer v. Rockwell Collins, Inc.*, 398 F.3d 1040, 1047 (8th Cir. 2005)).  Warmington must show that "the workplace is permeated with discriminatory intimidation, ridicule, and insult," *Sutherland v. Mo. Dep't of Corr.*, 580 F.3d 748, 751 (8th Cir. 2009) (quotation omitted), and that it is "extreme in nature and not merely rude or unpleasant."  *Nitsche v. CEO of Osage Valley Elec. Coop.*, 446 F.3d 841, 846 (8th Cir. 2006).

For several reasons, the Complaint's allegations do not establish a plausible Title VII hostile-work-environment claim.  The allegations for this claim appear in the

15

Complaint from paragraph 270 through 273, though paragraph 272 includes subparagraphs labeled (a) through (m), and paragraph 273 includes subparagraphs labeled (o) through (z). Compl. ¶¶ 270–273.  In her brief in opposition to the University's motion, Warmington cites all of these allegations to support her claim; she does not cite some as more important than others.  Mem. in Opp'n at 10.  Many of these allegations do not contribute to showing a hostile work environment because they have nothing to do with the kind of conduct associated with the creation of a hostile environment.   These include, for example, allegations that Warmington was excluded from participating in "the setup of the conference meet," Compl. ¶ 272(a), that some coaches "play[ed] golf in the hallway every day," *id.* ¶ 273(w), that other coaches "received a car as part of their compensation package," *id.* ¶ 273(x), that a "special dinner celebration" was held for another coach when he received an award, *id.* ¶ 273(y), and that Warmington was refused "assistance in dealing with use of school email by athletes to promote religious events that made other athletes feel uncomfortable," *id.* ¶ 273(z).  *See also id.* ¶¶ 273(o), (r), and (s).  Though some of the Complaint's allegations conceivably might contribute to showing a hostile environment in another case, they do not here.  For example, Warmington alleges that male track athletes were allowed by their coach "to drink on the bus on the way home from meets or at meets." *Id.* ¶ 272(i).   A permissive approach to college students' consumption of alcohol conceivably might contribute to the creation of a hostile environment, but here the Complaint identifies no hostile activities that resulted from these athletes' consumption, let alone hostile activities to which Warmington was subjected.  For another example, Warmington alleges that a UMD coach was not investigated though he "was aware of an

16

alumni race that was held at night on the track for the athletes where they would run naked."
*Id.* ¶ 272(j).  Again, it's not difficult to imagine circumstances where group nudity might
contribute to creating a hostile environment.  But the Complaint lacks allegations plausibly
permitting that inference here.   Warmington does not allege that she personally
encountered this activity; she does not allege the activity was a part of her workplace (at
least not during normal work hours).  The Complaint comes closest to plausibly alleging a
hostile work environment when it alleges that some of Warmington's colleagues uttered
always-inappropriate, always-offensive statements.   These statements were sometimes
graphic and included the basest of remarks about female athletes, *id.* ¶ 272(b), a female
UMD compliance officer, *id.* ¶ 272(f), and Warmington, *id.* ¶ 272(m).   Other statements
imply stereotypes, *id.* ¶ 272(d), or concerned Warmington's appearance, *id.* ¶¶ 273(q), (v).
These allegations do not establish a plausible hostile-environment claim for two reasons.
First, the Complaint provides no hint as to when or how often these statements were made
during Warmington's roughly 10 years at UMD.   The Complaint alleges that they
"occurred over a number of years," *id.* ¶ 271, but that is not enough to plausibly show that
this conduct pervaded Warmington's work environment throughout that time or during any
particular time.  Second, the Complaint nowhere alleges facts plausibly showing that the
University knew of these incidents so that it might take proper action, and Warmington
does not argue or explain by reference to allegations in her complaint how the University
should have known.[7]

---

[7]      Warmington alleges that she reported concerns to the University, but these reports
are alleged to have been made in other contexts.  Compl. ¶¶ 57 (reporting alleged generally

B

Warmington asserts Title IX claims in the second and third counts of her complaint, Compl. ¶¶ 287–96 (Count II), 297–306 (Count III), though the precise nature of these claims is not clear.   The counts have different titles.   Count II is entitled "**Unlawful retaliation and discrimination**."   *Id.* at 51.   Count III is entitled "**Creation of hostile work environment**."   *Id.* at 53.   But the same allegations support each claim; each claim is ten paragraphs long, and the ten paragraphs supporting each claim are identical, word-for-word.   *Compare id.* ¶¶ 287–296 *with* ¶¶ 297–306.   The allegations include references to "retaliation," "sex discrimination" generally, and "sexual harassment," *id.*, making it difficult to know the theory underlying each claim—or, in other words, how Warmington alleges the University violated Title IX.   Is it her termination or some other adverse employment action in retaliation for her protected activity?   Adverse action on the basis of her sex?   The existence of a hostile environment?   The Complaint is not clear.   The Parties' briefing clarified things, however.   In support of its motion to dismiss, the University argued in its opening brief that there is no "private cause of action for damages under Title IX" except for cases that "involved the vindication of the rights of students."   Def.'s Mem. in Supp. 10–11 [ECF No. 11].   For this assertion, the University cited several decisions

---

in the context of her termination), 96 (reporting concerns to the Athletic Director regarding "having a team made up of limited scholarship athletes among a majority of other athletes" with varying abilities and goals), 129 ("seeking backing in imposing a measure of discipline"), 151 (seeking "support from the athletic department administration in how to deal with" a variety of personal challenges faced by her athletes), 187 (requesting "more support for the mental, emotional, and physical help she needed to provide her team"), and 225 (reporting budget issues to the Athletic Director "on numerous occasions, with no results").

from courts in the District of Minnesota and other districts within the Eighth Circuit.  *Id.* In her opposition brief, Warmington spends just over two pages in defense of her Title IX claims; her argument runs from the bottom of page 12 to the top of page 15.  Mem. in Opp'n at 12–15.  There, Warmington explained that her "Title IX claims do not simply rest upon the discrimination treatment she herself [sic], which she certainly experienced, but her Title IX claims also allege that she was retaliated against and was subjected to a hostile work environment because of her advocating for the fair treatment of her teams and the athletes that [sic] participated on them."  *Id.* at 13.  As support, Warmington cited only a single case, *Jackson v. Birmingham Bd. of Educ.*, 544 U.S. 167 (2005), where the Supreme Court held that "Title IX encompasses claims of retaliation . . . where the funding recipient retaliates against an individual because he has complained about sex discrimination." *Jackson*, 544 U.S. at 171.  Warmington then argued only that her "Title IX claims are remarkably similar to those in *Jackson*."  Mem. in Opp'n at 14.  She did not defend her Title IX claims on any other basis.  Warmington is understood therefore to argue only that she has alleged a plausible Title IX retaliation claim.

The law governing a Title IX retaliation claim starts with *Jackson*.  There, the Supreme Court held that Title IX implies a private right of action for persons who suffer retaliation because they have complained about sex discrimination: "We conclude that when a funding recipient retaliates against a person *because* he complains of sex discrimination, this constitutes intentional 'discrimination' 'on the basis of sex,' in

violation of Title IX." *Jackson*, 544 U.S. at 174.[8]  "To state a claim for retaliation, a plaintiff must establish (1) that she engaged in protected activity, (2) that the funding recipient took a materially adverse action against her, and (3) that there was a but-for causal connection between her protected activity and the materially adverse action." *Du Bois v. Bd. of Regents of the Univ. of Minn.*, No. 19-CV-1676 (PJS/LIB), ___ F. Supp. 3d ___, 2020 WL 759949, at *5 (D. Minn. Feb. 14, 2020) (citing Eighth Cir. Model Civ. Jury Instr. § 10.40 and *Brine v. Univ. of Iowa*, 90 F.3d 271, 276 (8th Cir. 1996)).  An employee engages in protected activity when she complains of sex discrimination. *Id.* at *6.  The "protected activity" element is generally understood "to encompass actions that oppose [an employer's] actions that are not unlawful, as long as the employee acted in a good faith, objectively reasonable belief that the practices were unlawful." *Barker v. Mo. Dep't of Corr.,* 513 F.3d 831, 834 (8th Cir.2008) (quotation omitted).  A plaintiff may allege direct or indirect evidence showing plausibly "that the protected conduct was a determinative— not merely motivating—factor in the employer's adverse employment decision." *Tyler v. Univ. of Ark. Bd. of Trs.*, 628 F.3d 980, 985 (8th Cir. 2011) (internal quotation marks omitted).  "Generally, more than a temporal connection is required to present a genuine

---

[8]     In *Jackson*, the plaintiff, Roderick Jackson, was hired "to serve as a physical education teacher and girls' basketball coach" at a high school in Birmingham, Alabama. 544 U.S. at 171.  After "discover[ing] that the girls' team was not receiving equal funding and equal access to athletic equipment and facilities," Jackson "complain[ed] to his supervisors about the unequal treatment of the girls' basketball team, but to no avail." *Id.* After complaining, "Jackson began to receive negative work evaluations and ultimately was removed as the girls' basketball coach." *Id.* at 171–72.  Jackson sued, alleging "that the Board violated Title IX by retaliating against him for protesting the discrimination against the girls' basketball team." *Id.* at 172.

factual issue on retaliation, and only in cases where the temporal proximity is very close can the plaintiff rest on it exclusively." *Tyler*, 628 F.3d at 986 (internal quotation marks and citation omitted).  The possibility of inferring retaliation "vanishes altogether when the time gap between the protected activity and the adverse employment action is measured in months." *Id.*

Warmington plausibly alleges the first two elements of her Title IX retaliation claim. She plausibly alleges that she engaged in protected activity.  *See, e.g.*, Compl. ¶¶ 225–226. If the termination of her employment was enough to satisfy the "materially adverse action" element of her Title VII claim, then it should be enough for her Title IX claim, also.  In her brief in opposition to the University's motion, Warmington argued that her complaint "also makes clear how her workplace became more hostile and less supportive as she continued to advocate for her team and refused to stop, and how the workplace became even more hostile after the firing of Shannon Miller [the head women's hockey coach]."  Mem. in Opp'n at 13.  As support for this argument, Warmington cites paragraphs 145 through 178 and 193 through 205 of her complaint.  Mem. in Opp'n at 13.  These paragraphs do not plausibly allege that Warmington suffered harassment as an adverse employment action. Paragraphs 145 through 178 describe many challenges Warmington faced as a coach that she alleges generally resulted from the University's lack of support.  Compl. ¶¶ 145–178. The challenges alleged in these paragraphs say nothing probative about a hostile environment (in the relevant sense of that term).  Paragraphs 193 through 205 describe events following Miller's "successful lawsuit against UMD based on gender discrimination," *id.* ¶ 193, and are focused on describing how Warmington was asked, and

21

agreed, to write a "letter to the local newspaper supporting the school," *id.* ¶ 198.  Though these paragraphs appear under a heading that reads "**The Athletic Department Becomes More Hostile**," *id.* at 33, the paragraphs include no allegations plausibly showing a hostile environment.  *Id.* ¶¶ 193–205.[9]

Warmington does not plausibly allege that her Title IX-protected activity was a determinative factor in her termination.  She alleges no direct evidence to support this conclusion, a point her counsel conceded at the hearing.  Ordinarily, the next step would be to address indirect evidence of a but-for causal connection, but Warmington has not identified any indirect evidence.  Warmington alleges several times in her complaint that she was terminated because she advocated for gender equality under Title IX, but these allegations plead conclusions.  *See*, *e.g.*, *id.* ¶¶ 32 ("What is clear is that UMD, as Warmington was a voice for equality, wanted to end her employment for some time."); 227 ("Warmington was terminated because she made these reports and, at least in part, to keep this information from being reported, and to make her the scapegoat should the violations ultimately come to light."); 294 and 304 (alleging that Warmington was terminated "because [she] engaged in the protected activity described above"); 295 and 305 ("There was a causal connection between the University's adverse actions against Plaintiff and her protected activity.").  In her brief in opposition to the University's motion to dismiss,

---

[9]     If the lack of support Warmington alleges was a materially adverse employment action, the Complaint alleges no facts plausibly showing that the lack of support or its associated challenges increased at any particular time, much less in response to Warmington's protected activity.  The Complaint alleges explicitly that the University denied support to Warmington "continuously" during her tenure.  *Id.* ¶ 145.

Warmington identifies no indirect evidence of a but-for causal connection.  Mem. in Opp'n at 14.  She cites no allegations from her complaint.  *Id.*  She advances no theory based on temporal proximity from protected activity to her termination.  *Id.*  Instead, Warmington repeats the core of her Title IX retaliation theory: that her "continual advoca[cy] for her teams . . . resulted in" her eventual termination.  *Id.*  These assertions are consistent with the Complaint's allegation that the University "wanted to end her employment for some time" because she "was a voice for equality."  Compl. ¶ 32.  But these assertions do not plausibly show the but-for causal connection essential to Warmington's Title IX retaliation claim.  The allegation that UMD wanted to terminate Warmington's employment "for some time" is a conclusion without support.  The Complaint includes no allegations permitting the inference that UMD wanted to terminate Warmington's employment "for some time."  The Complaint's allegations imply that Warmington engaged in Title-IX protected activity throughout her tenure without adverse action.  *Id.* ¶ 225.  Warmington does not seem to say that more recent protected activity was the catalyst for her termination.  If that was her position, she has not identified that protected activity or its relationship—temporal or otherwise—to her termination.[10]

---

[10]    In *Blomker v. Jewell*, the Eighth Circuit dismissed a Title VII retaliation complaint under Rule 12(b)(6) because the plaintiff "attached to her complaint the [defendant's] letter of removal, which sets forth her reasons for termination" and "inclusion of the letter of removal in her complaint show[ed], on its face, that [the plaintiff's] protected activity was *not* a but-for cause of the alleged adverse action by the [defendant]."  831 F.3d at 1059–60.  Here, Warmington attached the University's termination letter to her complaint, and that letter says essentially that the investigation's outcome was the but-for cause of her termination.  Compl. Ex. 5 [ECF No. 1-7].  Regardless, *Blomker* does not seem to warrant the dismissal of Warmington's complaint because Warmington alleges here that the

C

Warmington asserts a claim under the Equal Pay Act, 29 U.S.C. § 206(d), in her complaint's fourth count.  Compl. ¶¶ 307–312.  Warmington alleges that she "was paid wages at a rate less than the rate the University paid to its male track and field and cross-country coach."  *Id.* ¶ 310.  Specifically, Warmington alleges that "until approximately 2017," she was paid "at least $5,000.00" per year less than the less experienced male head coach of the men's cross country and track and field teams.  *Id.* ¶ 85.  Importantly, Warmington also alleges that this pay disparity was corrected in 2016, when her pay was increased to match that of the men's coach.  *Id.* ¶ 87.  This allegation, it turns out, means that Warmington's complaint is self-defeating with respect to this claim.  This is because the statute of limitations for claims under the Equal Pay Act is two years from the time a cause of action accrues, or three years for willful violations.  29 U.S.C. § 255(a).  Warmington has not alleged a willful violation of the Equal Pay Act, meaning the statute of limitations for her claim is two years.  Though Warmington doesn't allege in her complaint the exact date in 2016 the alleged pay disparity was eliminated, it doesn't matter.  She filed this action on October 23, 2019, which is more than two years after any date in 2016.  In her brief in opposition to the University's motion, Warmington seems to argue that the limitations period should be tolled because "the University continuously extended the time period for its response to the Equal Employment [Opportunity] Commission investigation into her case."  Mem. in Opp'n at 15.  However, the law is clear that "filing

---

investigation leading to her termination was pretextual, Compl. ¶¶ 32–81, an assertion evidently not made in *Blomker*.

a claim with the EEOC does not toll the Equal Pay Act statute of limitations." *Brousard-Norcross v. Augustana Coll. Ass'n*, 935 F.2d 974, 979 n.11 (8th Cir. 1991) (citation omitted).

*

At the hearing, Warmington's counsel indicated that Warmington would stand on her original complaint and declined the opportunity to amend.

**ORDER**

Based on the foregoing, and on all the files, records, and proceedings herein, **IT IS ORDERED** that:

1.    Defendant Board of Regents of the University of Minnesota's Motion to Dismiss [ECF No. 9] is **GRANTED**; and

2.    The Complaint [ECF No. 1] is **DISMISSED** with prejudice.

**LET JUDGMENT BE ENTERED ACCORDINGLY.**

Dated:  April 21, 2020                         s/ Eric C. Tostrud
                                               Eric C. Tostrud
                                               United States District Court